

FILED
CLERK, U.S. DISTRICT COURT

01/03/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____AP_____ DEPUTY

N/S

Aladdin Dinaali
4160 W 182nd Street, Apt. 217
Torrance, CA 90504
310-989-9559
dinaali@mail.com

Plaintiff in Pro Per

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| ALADDIN DINAALI,<br><br>        Plaintiff,<br><br>vs.<br><br>COUNTY OF SAN BERNARDINO,<br><br>COUNTY OF SAN BERNARDINO<br>SHERIFF SHANNON D DICUS,<br><br>DOES 1-100<br><br>        Defendants | Case No.:  5:22-cv-00009-PA(KS)<br><br><br>**COMPLAINT PURSUANT TO 42 U.S.C. 1983 AND DEMAND FOR JURY TRIAL** |

COMPLAINT PURSUANT TO 42 U.S.C. 1983 AND DEMAND FOR JURY TRIAL- 1

## I. JURISDICTION & VENUE

1.  This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. The court has jurisdiction under 28 U.S.C. Section 1331 and 1343 (a)(3). Plaintiff seeks declaratory relief pursuant to 28 U.S.C. Section 2201 and 2202. Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. Section 2283 & 2284 and Rule 65 of the Federal Rules of Civil Procedure.

2.  The Central District California, Eastern Division is an appropriate venue under 28 U.S.C. Section 1391 (b)(2) because it is where the events giving rise to this claim occurred.

## II. PLAINTIFF

3.  Plaintiff, ALADDIN DINAALI (hereinafter referred to as "Plaintiff"), was at all times mentioned herein a pre-trial detainee/post- trial prisoner in care of the County of San Bernardino and Sheriff of the County of San Bernardino, State of California in two county jails for a period of just over two years.

## III. DEFENDANTS

4.  Defendant SAN BERNARDINO COUNTY (hereinafter referred to as "County") is legally responsible for the operation of its Sheriff.

5.  Defendant SHERIFF SHANNON D DICUS (hereinafter referred to as "Sheriff") is legally responsible for the operation of the Sheriff Department and County jails and for the welfare of all its inmates. Defendants will be collectively referred to as ("Defendants") hereinafter.

COMPLAINT PURSUANT TO 42 U.S.C. 1983 AND DEMAND FOR JURY TRIAL- 2

6.  Defendants, Does 1-100, employees of the County are unknown to Plaintiff at this time. Plaintiff will seek leave of the court to amend the pleading when the names become available.

7.  Each defendant is sued individually and in his or her official capacity. At all times mentioned in this complaint, each defendant acted under the color of state law.

## IV. INTRODUCTION

8.  This civil rights action seeks an injunction from this Honorable Court, and compensatory and punitive damages from Defendants for violating various rights under the United States Constitution and state law in connection with the illegal and inhumane treatment Plaintiff has suffered at the hands of the Defendants while in their custody before, during and after a sham trial and wrongful conviction in a kangaroo court from December 22, 2017 to January 3, 2020 before being transferred to a state prison.

9.  Plaintiff who was persecuted and maliciously prosecuted for exposing the negligence and corruption of County and the United States Department of Housing and Urban Development (hereinafter referred to as "HUD"), is no longer in custody after having completed an unjust and prolonged sentence.

10.  The erroneous judgment is currently under appeal and this suit seeks in part an injunction for the audit of the reporter's transcripts of the court proceedings as Plaintiff has evidence to believe that the transcripts were illegally altered in order to defeat his appeal.

11.  Plaintiff will amend the present Complaint with a Declaration consisting of relevant exhibits and additional declarations as soon as Plaintiff has the ability and resources to do so.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### V. FACTS

12.   Plaintiff is a former HUD inspector/consultant. Prior to holding that position, Plaintiff was a building inspector with many jurisdictions across Southern California such as Los Angeles County's Department of Public Works and Building and Safety Divisions of many Cities such as but not limited to Rolling Hills Estates, Rancho Palos Verdes, Santa Clarita, South Pasadena and many more.

13.   On or about June 2014, Plaintiff was asked to inspect a HUD Manufactured Mobile Home (hereinafter referred to as "Manufactured Home") in Phelan, an unincorporated town in San Bernardino County. The reason for the service was that the owners of the Manufactured Home (hereinafter referred to as "Owners") wanted to refinance their mortgage loan in order to get equity cash out as they were facing unemployment and financial hardship and the inspection was a mandatory part of the process.

14.   During the course of the investigation of the matter, it was revealed to Plaintiff that the Manufactured Home was never properly installed or permitted when it was transferred from a factory in 1992 and installed on a piece of land in Mohave Desert which had never been developed before. No water, electrical, or gas meters existed on this property prior to installation of this structure. No inspection records existed to prove that the property was ever inspected for compliance either by a County official, or a HUD inspector such as Plaintiff.

15.  It was further revealed to Plaintiff, that Owners had illegally remodeled the Manufactured Home which included an entire-house repipe without proper permits and inspections. The Manufactured Home is a cesspool of dangerous and unpermitted work.

16.   Unpermitted electrical, gas and water installations are all defective and dangerous.

17.   As no certificate of occupancy issued by the jurisdiction existed to show that the property was safe to be occupied–as it is mandated by state and federal laws–it was, and remains to this date illegal and unsafe to occupy the Manufactured Home, as it has erroneously been since 1992.

18.   Furthermore, based on HUD rules and regulations, the Manufactured Home's existing FHA loan did not qualify for the cash-out refinance as the Owners had planned. Plaintiff's investigation revealed that HUD had erroneously approved several loans to previous owners since the installation of the Manufactured Home since 1992 despite the fact that the property did not meet the most basic requirements for issuing and refinancing FHA loans. It became clear that the Manufactured Home had never been inspected by a single inspector, either from the County's building and safety division  or a field HUD inspector since its installation. This was a massive and gross case of negligence by County and HUD officials.

19.   Upon these findings, Plaintiff attempted to rectify the issue before the matter could go any further and as such, requested that the Owners comply with the HUD and Building Code requirements and obtain the required permits and inspections before their loan could be approved.

20.   However, unbeknownst to Plaintiff, one of the Owners was a former sheriff deputy with deep ties to active Sheriff deputies. The loan broker had an attorney uncle with ties to deputy district attorneys.

21.   As Plaintiff's requirements prevented the Owners to immediately obtain cash, and by extension, the matter prevented the lenders to earn any commission for a while. However, in lieu of complying with the requirements, Owners threatened County and

HUD officials with lawsuits if they were forced to go through the process prescribed by Plaintiff.

22.  In the meantime, through their connections with Sheriff's deputies, Owners filed a false and malicious police report alleging extortion by Plaintiff. Owners falsely claimed that while there was absolutely nothing wrong with the Manufactured Home, Plaintiff was inventing defects in order to enrich himself. This, despite the fact that not only Plaintiff had not asked for any monies, but that on the contrary he had offered to work for free in order to get the situation resolved. This, also despite overwhelming evidence supporting Plaintiff's claims, mainly the lack of any required documentations at all–a prerequisite for any structure to be occupied across the State of California.

23.  In light of this blatantly egregious and false claim, Plaintiff asked County and HUD officials to inspect the property to back up claims made by him. However, as County and HUD would be held liable in a court of law for their gross negligence by Owners if they did substantiate Plaintiff's legally binding Non-Compliance Report issued against the Manufactured Home, both parties declined to inspect the house.

24.  In order to exonerate himself against the false claims made by Owners, and in order to effectuate compliance, Plaintiff visited the subject property and took some pictures of the exterior of the property in order to prove that the structure was defective and dangerous to inhabit. This, notwithstanding the fact that even if the Manufacture Home were not substandard, it still did not meet the requirements for the loan because of the lack of permits, and inspection and approval records.

25.  Owners were not home at this time. While Plaintiff was outside of the property taking pictures, one of the Owners who was the former sheriff deputy arrived. Owner who had

never met Plaintiff, exposed his gun and threatened Plaintiff when he found out who Plaintiff was and what he was doing. Owner threatened that he was a sheriff deputy and if Plaintiff wished to take the matter any further, he would be framed and arrested.

26.  Not bowing to the extortion threat, Plaintiff immediately submitted a report to County and HUD officials documenting the events and again requested that County and HUD officials visit the site.

27.  However, a couple of days later, Plaintiff was arrested on fabricated charges of extortion and burglary. Despite the fact that Owners knew who Plaintiff was, in their police report they had claimed that they had found an unknown Middle Eastern man (Plaintiff is of Middle Eastern origins) attempting to plant bombs under their house. Owners had claimed that Plaintiff had also trespassed INSIDE the Manufactured Home. County bomb squad was called in to search the property for bombs.

28.  Plaintiff was originally pulled over while driving by a City of San Bernardin police officer who detained him while two County sheriff deputies who would later introduce themselves as close friends of Owners arrived at the scene. These two deputies, would go on to falsify the arrest reports. The Sheriff's documents obtained later during the trial exposed the fact that the two deputies were not even on duty on that day but had arranged a set-up so that they would be the ones who would be arresting Plaintiff as he is a resident of Los Angeles and had travelled to San Bernardino just for this project. Plaintiff was arrested in a trap set up by Sheriff.

29.  At the time of the arrest, the lead deputy confiscated Plaintiff's phone which contained the pictures of the Manufactured Home in serious violation of building codes.

30.  Despite the fact that Plaintiff had immediately posted bail, but he was not released from jail until the afternoon of the following day during which time the deputy had obtained a search warrant issued based on false pretenses and a completely fabricated affidavit. The deputy confiscated two computers and several discs containing the back-up of the pictures and much evidence against Owners, County, and HUD.

31.  After five years of struggle, County released to Plaintiff only some of the material contained in the phone and computers during the trial. All the exculpatory evidence against the parties was completely and illegally wiped off Plaintiff's electronics and withheld at trial.

32.  The little evidence Sheriff and District Attorney (thereinafter referred toas "D.A.") did release to Plaintiff, was promptly and illegally confiscated from him while awaiting trial in jail. Plaintiff unsuccessfully made numerous efforts through the court to have the documents returned.

33.  Upon completion of sentencing six years after the illegal search and seizure of the phone and computers, Plaintiff attempted to retrieve the items. Sheriff first refused to hand over the items and only faced with a motion with the court did it return the times albeit only after having wiped the electronics. The disks were completely gone, as were several physical items of evidence.

34.  While Sheriff charged Plaintiff with burglary, it is Sheriff who is the real crook here committing crimes after crimes under color of authority.

35.  During the course of the prosecution, and before the preliminary hearing, D.A. and Sheriff threatened Plaintiff with additional charges if he did not plead guilty to the charges and withdrew a civil action Plaintiff had initiated against Owners, lenders and brokers in

the case. County wanted plaintiff to retract his assertions that the Manufactured Home was illegal to occupy. Plaintiff was shown doctored pictures of one of the Owners all bruised up and injured. County was ready to allege that Plaintiff had attacked and injured Owners at the time he visited the site if he did not back off his claims.

36.  When Plaintiff did not acquiesce, additional fabricated charges were brought against him, his bail was revoked and new bail amount was increased dramatically to $200,000 based on new trumped-up charges and Plaintiff was remanded into custody again after the preliminary hearing where he was completely deprived of his constitutional rights.

37.  Plaintiff's attorney who had entered into collusion with D.A., never allowed Plaintiff to present any evidence against the government at the hearing and in fact aided and abetted D.A. in standing Plaintiff for trial.

38.  Plaintiff's case has been overseen by fourteen judges and he has been represented by fourteen attorneys during the case. All of these attorneys colluded with D.A. after having been threatened with repercussions for representing Plaintiff.

39.  Plaintiff's family members were threatened with criminal charges of aiding and abetting if they decided to appear at the preliminary hearing in defense of Plaintiff.

40.  Further down the road, Plaintiff's private investigators–he went through five of them–and legal assistants would also be threatened with repercussions when he was forced to represent himself in the trial after having spent tens of thousands of dollars in attorney's fees and legal costs only to have attorneys to backstab him and work against him.

41.  Plaintiff thereafter posted bail a second time and was released from custody again to fight the fabricated charges.

42. In the meantime, Plaintiff had placed a mechanic's lien on the Manufactured Home in order to (a) prevent the fraudulent transactions to go through and (b) to recuperate the cost of his defense and bail amounts. This had caused the Owners to hire attorneys to defend against the lien in a civil court in the City of Santa Monica.

43. While out on bail fighting the charges, a few days after the terrorist attacks in San Bernardino in December 2015, Plaintiff received a phone call from Orange County bureau of FBI and was informed by an agent that Owners' attorneys had made an outrageous claim that Plaintiff was related to the terror attack and alleged terrorists. One of the alleged terrorist was a Middle Eastern County Health Inspector, not much unlike Plaintiff, a former Middle Eastern Los Angeles County and then-current HUD inspector.

44. Plaintiff would also later learn that the attorneys had made similar claims to D.A. in a fabricated letter.

45. While nothing came of the false allegations back in December 2015, however, the letter and the FBI agent would play a significant role later in 2017 when the case was still ongoing–due to several pending motions at the court–and when Plaintiff came across an ABC special production about the terrorist attack.

46. The TV special confirmed Plaintiff's suspicions that the Middle Eastern husband and wife who were accused of the terror attack and who were murdered by Sheriff, were in fact innocent and were part of a False Flag operation. All evidence proved that it was Sheriff who also murdered the people who were killed in the terror attack and not the Middle Eastern husband and wife.

47. Plaintiff who is also a web designer and internet host and video producer, published several websites chronicling the ongoing case intended to be shown to the jury during

COMPLAINT PURSUANT TO 42 U.S.C. 1983 AND DEMAND FOR JURY TRIAL- 10

the course of trial. One of the websites was dedicated just to the terror attack providing irrefutable evidence of Sheriff and FBI's involvements in the terror attack of 2015.

48.  The civil court judge  in Santa Monica, in an illegal collusion with San Bernardino officials, forced Plaintiff to take down the websites and the videos exposing the False Flag operation after erroneously finding him in contempt of a court order which Plaintiff had never received and even if he did it would have been an illegal order. Facing jail time just for the websites, Plaintiff took down the sites. A violation of his freedom of speech.

49.  After the sites went down, Plaintiff's bail was revoked completely on December 22, 2017, after a sham hearing and was remanded into custody of Sheriff without bail where he stayed until his transfer to Kern County's Delano State Prison on January 3, 2020, after his wrongful conviction to serve out his unjust and excessive sentence.

50.  Plaintiff was sentenced to multiple consecutive sentences for the same event while sentencing guidelines indicated that he was eligible for probation because he had no prior records of any criminal activities. Plaintiff was denied probation because he was deemed a risk because of his race and religion. A violation of due process and civil rights in every shape or form.

51.  Sheriff and D.A. were able to have Plaintiff's bail revoked and have him remanded into custody before the trial right after a judge was ready to dismiss the case against Plaintiff. County disqualified the judge immediately and had the case transferred to a different judge.

52.  In a completely fabricated motion based on lies corroborated by perjured testimony, it was alleged that Plaintiff was in fact a Middle Eastern terrorist actively in contact with

COMPLAINT PURSUANT TO 42 U.S.C. 1983 AND DEMAND FOR JURY TRIAL- 11

terror organizations. D.A. had expressed concerns for his safety claiming that Plaintiff was dangerous and that he intended to harm him with the help of terror organizations.

53.  The FBI agent who had first contacted Plaintiff two years prior and who was involved in the case, ignored Plaintiff's subpoena to appear at the hearing to confirm that Plaintiff was not a terrorist. The same agent would defy a subpoena again during the course of the trial.

54.  Moreover, Plaintiff's attorney, in a collusion with D.A., not only intentionally failed to defend him against the false allegations, but in fact actually aided D.A. in having Plaintiff incarcerated.

55. As such, Plaintiff was held without bail unable to properly defend himself thereafter.

56.  As it would be explained below, this was the start of a series of violations of Plaintiff's rights by County and Sheriff which continue to this date, thus the necessity for this suit.

57.  Also, as this was the thirteenth attorney who had represented Plaintiff in this single case, he asked to be represented by himself in pro per for the remainder of the case and trial as he knew no attorney would defend him in face of threats by D.A. and Sheriff.

58.  However, unbeknownst to Plaintiff, a scheme was concocted to have him declared insane and incompetent to stand trial and he was ordered to undergo medical evaluation.

59.  As the result, the trial which was by that time set for January 19, 2018, was not held until December 13 of that year while Plaintiff went through a sham medical evaluation process and a sham competency trial.

60.  As part of the process, Plaintiff was first interviewed by a State appointed attorney who declared Plaintiff insane after asking only a few basic questions about his background and education to which Plaintiff had answered he had licenses and

COMPLAINT PURSUANT TO 42 U.S.C. 1983 AND DEMAND FOR JURY TRIAL- 12

certifications in building engineering, construction, inspections, appraisals, real estate sales and property management.

61.  Plaintiff was then evaluated by three State psychiatrists, two of whom would claim that Plaintiff was extremely sick and delusional and incompetent to stand trial. One of the doctors had falsely claimed that Plaintiff had passed out during the course of the evaluation and that he did not know where was when he came to. Another doctor had claimed that Plaintiff had verbally attacked her and could not answer questions.

62.  The two doctors had recommended that Plaintiff be incarcerated in a Patton State mental hospital and be forcibly drugged.

63.  The one doctor who reported that Plaintiff was perfectly fine and competent to stand trial, was later forced by D.A. to backtrack and join the other two in declaring Plaintiff incompetent at the competency trial.

64. The aim of the County was to turn Plaintiff into a vegetable by forcibly injecting him with drugs. Had Plaintiff not been familiar with the laws regarding the matter, this is exactly what would have happened to him and he would have been a vegetable right now.

65.  At a hearing when the judge was about to sentence Plaintiff to Patton State Hospital, he asked to have a jury trial and to have his competency tried by a jury.

66.  While the judge initially agreed to a jury trial, but she kept postponing the trial for months until the supervisor of the court stepped in and transferred the trial from Victorville courthouse where the case was filed to San Bernardino's courthouse.

67.  At that competency trial, Plaintiff's state attorney forced on him by the County told the jury that Plaintiff was insane and extremely dangerous to the public. Attorney prevented Plaintiff to testify on his own behalf in violation of the constitution.

68.  During the sham trial, the state doctors repeated the false allegations made in their fabricated reports under penalty of perjury claiming that Plaintiff was so sick that he would passes out. This, while Plaintiff was completely alert during the entire trial and was being astutely observed by the jury members two of whom were medical interns.

69.  Left with no other choice, Plaintiff who was denied the opportunity to speak to the jury, had an outburst interrupting the proceedings by telling the jury that he was being set up by the County and that he had tried unsuccessfully to disqualify the attorney who was representing him by making false accusations and that Plaintiff wished to go to trial to exonerate himself.

70.  The verdict was that Plaintiff was competent to stand trial.

71.  As the result of this, the judge who had declared Plaintiff to be insane was removed from the case, as was the attorney who had declared him to be insane, and the file was sent to another court.

72. The new judge was immediately disqualified by the D.A. when she showed sympathy towards Plaintiff and allowed him to represent himself for the trial and offered to further allow him a private investigator and a paralegal assistant at a next hearing.

73.  The new judge who would replace her, would not allow Plaintiff a private investigator or a paralegal. Plaintiff would also lose the right to use the law library at jail.

74.  When Plaintiff tried to disqualify the judge due to his outright discrimination, the judge punished him by making him to go to court for a month and half every day all

shackled up until another judge was found to be willing to take the case. By then, the case had gone through thirteen judges and nobody wanted to touch the case.

75.  The 12-hour process of transfer from the jail to the courthouse every day and back put extreme physical and emotional stress on Plaintiff.

76.  In the meantime, the very deputy sheriff who was in charge of the case, the friend of the Owners, was assigned as the jail supervisor in Adelanto Detention Center where Plaintiff was being held.

77.  Shortly after deputy's transfer, Plaintiff was violently attacked by an inmate at deputy's orders to a point where he was transferred from that facility to Valley Detention Center in Rancho Cucamonga. Plaintiff's personal belongings were all stolen by several inmates while he was being beaten up.

78. This, after Plaintiff had already been transferred three times within the facility after being attacked by other inmates at the order of jail guards.

79.  The inhumane treatment of Plaintiff was taken to another level when a sympathetic D.A. deputy at a different office convicted the Plaintiff's attacker for assault and battery.

80.  Plaintiff would be transferred from dorm to dorm a total of nine times while in Sheriff's custody due to attacks by other inmates and theft of his personal property at the order of jail guards.

81.  Meanwhile, Plaintiff was deprived of badly needed medical care since he was first detained. Plaintiff never received any medical care when he contracted severe flue when he first arrived at jail resulting in severe sickness an entire month. He was not given his asthma and chronic pain medications. When he filed grievances, he was attacked by

other inmates warning him not to exhaust the grievances at which point he was moved to another dorm.

82.  Plaintiff never received any medical attention at all for the brutal beating he received at the hands of the felon who was convicted of his assault and battery.

83.   After being maliciously and needlessly transported to court every day on the bogus ground of finding another court in retaliation for attempting to recuse the judge–Plaintiff could have been kept at jail while another court was being considered and there was absolutely no need for him to be sitting in a court holding cell–Plaintiff was transported everyday to trial for another two months while the trial took place from December 3, 2018 to February 7, 2019.

84.  During this three and half months, Plaintiff would be woken up at 3 a.m. and be transported to the court during an hour-long bus drive while shackled to four other inmates. By the time Plaintiff returned from court, it would be between 7 and 8 p.m. each night.

85.  All the while, Plaintiff was deprived of lunch while at court because the only food available to him was a peanut butter sandwich every single day for almost four months. Plaintiff cannot physically eat peanut butter sandwich without getting seriously sick.

86.  Also, by the time Plaintiff returned from the court, jail dinner would already be over and he would be provided with another peanut butter sandwich which he would pass on to other inmates.

87.  Plaintiff relied on food he bought at commissaries to sustain himself during his stay at the jail. But his commissaries would either be stolen by other inmates while he was

at court, or they would be tossed out as contraband by jail guards during raids. As the result, Plaintiff would go hungry during the course of the trial which lasted two months.

88.  In the meantime, Plaintiff's family had provided him at jail with hundreds of pages of documents and evidence at enormous cost which he intended to use during the trial.

89.  However, during the course of the trial, jail guards would systematically raid Plaintiff's bunk and his drawers every few days and throw out or destroy his commissaries and food and would go through his documents. Soon, Plaintiff found out that his legal documents would go missing during these raids.

90.  When Plaintiff filed grievances regarding the theft of his documents, his entire stash of legal documents was removed from his possession.

91.  Plaintiff filed a motion with the court to have his documents returned. While jail officials did return some of the documents, the most important exculpatory evidence against the County was withheld and never given back to Plaintiff.

92.  When Plaintiff protested, he was told that there was a separation of powers between the court and the jail and that the judge could not order Sheriff around.

93.  When plaintiff took the matter back to the judge, the judge simply shrugged his shoulders and told Plaintiff that there was nothing more he could do and told him to go sue Sheriff if he wanted his documents back. This knowing full well that (a) Plaintiff did not have the resources to do so, and (b) even if he did there was simply no time as the trial was ongoing and it would be too late for the documents to be useful even if Plaintiff was able to get the documents back.

94.  Sheriff had also in the meantime blocked Plaintiff's family from providing him with any more documents under the threat of bringing charges against family members for

aiding and abetting as most of the legal documents involved in the case had been prepared and served by his family members. Family members had been extorted that they would be dragged into the case if they helped Plaintiff in any shape or form any further.

95.   Elsewhere, Plaintiff had filed an appeal when the judge whom he had disqualified refused to recuse himself from the case. When the appellate court denied Plaintiff's appeal, the matter was then taken to the California Supreme Court where it took up the writ of certiorari ordering County to answer within a certain time period. Plaintiff was ordered to reply a few days after the answer was filed by County.

96.   However, immediately after filing of an answer by County, Plaintiff was assaulted by an inmate unprovoked in front of everyone when he was just standing and conversing with another inmate. Despite the fact that incident was witnessed by tens of people present at the dorm at the time and captured on surveillance video, and despite a sworn statement by the person whom plaintiff was talking to, Plaintiff was declared the aggressor in the incident by officials and as punishment he was put in a solitary confinement known as 'Hole' for several days.

97.   While serving the solitary punishment, all Plaintiff's belongings, including legal documents were confiscated and put in storage. When Plaintiff did receive his property back after the end of the punishment period, he discovered that many items of evidence relating to the judge were missing.

98.   Plaintiff was also denied the opportunity to attend the law library to prepare the reply requested by the Supreme Court.

COMPLAINT PURSUANT TO 42 U.S.C. 1983 AND DEMAND FOR JURY TRIAL- 18

99.  As the result of this malicious and criminal acts of Sheriff, Plaintiff was unable to timely and effectively comply with the Supreme Court's requirements and as the result his case was ultimately rejected, especially in light of the fact that California Attorney General's office had outright misrepresented the case to the Supreme Court knowing full well that Plaintiff could not possibly dispute the fabricated accounts of County's answer with the required documents all gone at the hands of Sheriff. Plaintiff was ultimately unable to prove that County was sabotaging the process.

100.  Had Plaintiff not been put in a solitary confinement Hole based on fabricated charges and had his legal papers not been confiscated inside the jail–thus having been deprived of the ability to timely produce legal documents against the judge and the case– the Supreme Court would have certainly dismissed the case.

101.  Moreover, during the course of the trial, the judge illegally and unfairly prevented Plaintiff from calling any friendly witnesses in his defense. The judge also refused to hold in contempt all the hostile witnesses who refused to comply with Plaintiff's subpoenas.

102.  The only witnesses who appeared at the trial were D.A.'s witnesses. Every single one of the witnesses knowingly lied on the stand. Instead of holding the witnesses in contempt for perjury when Plaintiff would catch them in a lie on cross-examination, the judge would prevent Plaintiff from any further cross-examinations and would dismiss the witness so as no more perjuries would be exposed by the lying witnesses.

103.  Furthermore, Plaintiff was prevented from submitting into evidence the little exculpatory material he was left with against County.

COMPLAINT PURSUANT TO 42 U.S.C. 1983 AND DEMAND FOR JURY TRIAL- 19

104.  While it became very clear to anyone who was closely watching the trial that things were going very badly for the prosecution and the judge, Sheriff began a campaign of harassment against Plaintiff at jail.

105.  Jail guards would conduct random raids into his bunk. They would throw all his belongings around at midnight when he had to wake up 3 a.m. to get ready to go to court. Sheriff would plant contraband in his possession during the raids which would result in Plaintiff's punishment including but not limited to being sent to Hole on fabricated charges and lack of access to law library and phone calls which were crucial to Plaintiff's defense. Without access to law library for preparing the trial materials and phone calls for legal research, Plaintiff was deprived of effective defense at trial.

106.  Jail guards would also bring maximum mental hardship in any shape or form possible such as disparaging him in front of all inmates and encouraging other inmates to attack Plaintiff verbally or physically in order to break him down so that he could not perform effectively during the trial.

107.  Plaintiff would be put in the most uncomfortable way possible while riding on the bus to and from the courthouse during the trial. This, while being shackled at arms and feet and attached to four others after having been abused by the guards before getting on the bus.

108.  Up until the very end of prosecution's case, it was everyone's belief that County was going to lose the case due to the disastrous cross-examination of the witnesses, every single one of whom was caught lying on the stand by Plaintiff. The witnesses included several sheriff detectives including the bomb squad member along with his bomb sniffing dog, County building and safety chiefs, chief code enforcement officer,

County registrar personnel, water district manager, attorneys, an engineer, brokers, as well as the Owners.

109.    At this point in trial, when faced with certain defeat, D.A. shifted strategy and offered Plaintiff a chance to include any evidence which he wished–this after having objected to many pieces of evidence, most importantly the statements and reports from the FBI agent in relation to the San Bernardino terror attack–if Plaintiff agreed to testify in his own behalf. This would turn out to be a dirty trick by D.A., a mistake which would cost Plaintiff the trial.

110.   Not only D.A. refused to honor his pledge and would not allow the FBI agent to appear or have his statement and report in regards to the terror attack made available to the jury, but on cross-examination of Plaintiff, D.A. introduced to the jury some documents which were purportedly downloaded from Plaintiff's computers.

111.   The documents in question, namely a preliminary mechanic's lien notice and a ruling from a civil case's appeal were doctored in order to deceive the jury.

112.   The evidence was never before shown by D.A. and even when Plaintiff had asked D.A. to show him all evidence D.A. intended to bring into trial, Plaintiff was erroneously told that he was provided with all evidence in the case and that there was nothing left. D.A. reiterated this claim when a motion was filed to have California Attorney General to take over the case due to D.A.'s prosecutorial misconduct. D.A. is on record as stating no evidence not already provided to Plaintiff would be brought up at trial. Yet, Plaintiff was smacked with the doctored documents when sitting in the witness chair on cross-examination without the ability to authenticate the documents.

113.  Based on these fabricated documents and evidence and perjured testimonies of all white witnesses, D.A. argued to the jury–consisting of twelve women, eleven of whom were white and very obviously very racist picked after a completely rigged jury selection process where every civil right owned by Plaintiff was violated–that Plaintiff was a dangerous misogynist Middle Eastern man who was a menace to the community.

114.  It is ironic that Plaintiff was put in that position while trying to save the community from negligent building officials who had put the lives of the Manufactured Home's occupants at risk through utter incompetence and negligence.

115.  In order to refute Plaintiff's claims, County's building officials had forged and manufactured several pieces of document such as a certificate of occupancy, building permits, insurance documents, as well as a forged certification that the Manufactured Home was built in compliance with HUD codes.

116.  However, as ignorant as County officials were, they forged the documents with wrong dates. While the Manufactured Home was built in 1987, however, it was not installed until 1992. In their glorious incompetent ways, County officials had dated all the forged permits and certificate of occupancy 1987, the year it was built and the year it was installed at the site.

117.  While County's registrar's records show that the property was undeveloped until 1992 and there was nothing but land worth $20,000, County's Building and Safety Division documents show that the building was permitted, installed and inspected in 1987.

118.  Plaintiff had at the very outset of the case obtained the records of the property from County and the package did not contain any of the documents which were later

criminally added to the file and brought into the trial. Building officials perjured themselves when confronted by Plaintiff at trial.

119.    Also, in order to refute Plaintiff's claim that the Manufactured Home was substandard, Owners had hired an unscrupulous engineer who was neither qualified to certify the property, nor had she ever been to the site to inspect it. The engineer had just issued a false certification upon receipt of a payment without even knowing what was at stake before certifying it. On cross-examination, engineer admitted that she never went to the property but she lied on the stand stating that she had certified the property based on inspection of her lieutenant. Plaintiff had inquired with the lieutenant and had established that he had not been to the site either and that this was just a fly by night operation that a fabricated certification was issued just upon receipt of a payment.

120.   The engineer and her lieutenant who is a mobile home installer, are part of a racket which installs and certifies STATE MOBILE HOMES. The pair are only licensed and authorized to work on STATE MOBILE HOMES and not HUD MANUAFACTURED HOMES which is a completely different standard altogether. One is under the jurisdiction of state government, and the other is under the jurisdiction of federal government.

121.   In this case, County could not possibly legally approve the Manufactured Home based on the engineer's certification even if the property were not substandard as it does not have jurisdiction to do so by the operation of law. This, notwithstanding the fact that the engineer could not possibly have certified the property even if she were qualified if she had not been to the property herself. Under no circumstances, the County documents could stand test of law.

COMPLAINT PURSUANT TO 42 U.S.C. 1983 AND DEMAND FOR JURY TRIAL- 23

122.  County has fabricated contractors' workman compensation insurance certificates. Plaintiff was provided with workman compensation insurance certifications dated 1987 with numbers that were not issued until a decade later. It was clear that County had picked some other permits and doctored the dates to make it look as if they belonged to the subject property. Again, there was no home installed on that land in 1987. County official are stone cold crooks.

123.   While there are over three thousand seven hundred pieces of documents consisting of hundreds of exhibits and several charges, the jury came back with a guilty verdict on all charges within an hour after the start of deliberations. Jury also asked for their identities to be sealed.

124.  Upon information and belief, Plaintiff is of the view that just as in the case of every single person involved in the case who had been threatened and intimidated by D.A. which all resulted in Plaintiff being backstabbed, the jury was intimidated into convicting Plaintiff by the judge and D.A. Jurors looked petrified coming into the courtroom and fled the minute they could without a glance. Plaintiff saw twelve petrified women on that day because of the lies the judge and D.A. had told them during the trial.

125.  After the wrongful conviction, Plaintiff attempted to file a motion for new trial but the judge denied him the ability to represent himself in pro per and instead appointed him the very same attorney who had declared Plaintiff to be crazy a few months prior. This attorney never once contacted Plaintiff in regards to the motion for new trial except one time when he went to jail threatening Plaintiff with total destruction of himself and his family if he attempted to disqualify the attorney again.

126.  Counsel made good on his promise when Plaintiff attempted to disqualify him a second time and destroyed every and any chance of ever being granted a new motion for trial.

127.  This unscrupulous attorney put off the hearing for a motion for new trial and sentencing approximately nine months while he received and reviewed more three thousand seven hundred pages of trial transcripts and when he did finally file a motion, counsel told the court hat not only there were no grounds for new trial, but that the D.A. and the judge very actually very generous to Plaintiff who should have been sent to Patton State Hospital and forcibly drugged. The motion only helped to hurt Plaintiff's chances of an appeal.

128.  Meanwhile, between February 7, 2019, the conviction date, and December 13, 2019, the sentencing date, Plaintiff was mentally and physically tortured by Sheriff.

129. Just a few days after the conviction, on or around February 12th, Plaintiff suffered a massive paralysis-like attack due to the stress of more than four months of travelling back and forth to the court and then the horror of the wrongful conviction and the prospect of spending many years behind bars. As the result, Plaintiff was not able to move around at all and he had to be carried to restroom by other inmates for several days until he regained partial ability to move.

129.  Sheriff failed to provide Plaintiff any medical care or even a walker and Plaintiff suffered horribly for months as the result.

130.  In the meantime, the plumbing in Plaintiff's dorm had started leaking since January of that year but jail officials failed to fix the repair and as the result there was filthy standing toilet water all over the floor around Plaintiff's bunk area.

COMPLAINT PURSUANT TO 42 U.S.C. 1983 AND DEMAND FOR JURY TRIAL- 25

131.  A month after the partial paralysis attack, Plaintiff who could hardly walk by this time and was in constant pain, had a slip and fall in the standing water when he tried to leave the area resulting in massive concussion to the head. The pain in other areas of the body due to partial paralysis worsened after this fall.

132.  While the whole incident was captured on camera, Plaintiff received no adequate medical aid. The plumbing leak was not fixed until three more inmates fell in the exact same spot and Plaintiff stopped the leak from going to his area himself. It was only then that the facility maintenance stopped the leak temporarily until it started again.

133.  Plaintiff suffers from this massive fall to this date and will continue to suffer for the remainder of his life.

134.  In order to document all these events, Plaintiff used the facility's electronic grievance system to file grievances against Sheriff.

135.  Plaintiff was approached by a jail official and warned that if he intended to exhaust his grievances, he could face serious consequences.

136.  When Plaintiff did not heed to the warning and filed the maximum allowance of three grievances simultaneously on the electronic machine, he was issued another citation and sent back to the Hole again for several days allegedly for violation of the grievance system. Sheriff had duplicated a same exact grievance and was now falsely claiming that Plaintiff was filing repetitive grievances. Despite the fact that the time stamp and number on both tickets were identical, meaning it was the exact same grievance printed twice, Sheriff was counting it as two separate ones thus the grounds for solitary confinement.

137.  Upon filing more grievances, Plaintiff was once again attacked and injured by an inmate and sent to Hole one more time. Sheriff was once again claiming that it was Plaintiff who attacked the other inmate even though it happened in front of the entire dorm at lunch table, was captured on camera and happened in plain view of several guards who witnessed the incident.

138.  While in the Hole, Plaintiff filed more grievances. However, as his departure from the facility and transfer to a state prison was imminent, Sheriff never responded to any of the grievances past the allowable time. Sheriff completely ignored all grievances approximately two months before his departure.

139.  On or around January 2, 2020, the day before his transfer to state prison, as there was a limit as to how much legal documents Plaintiff could transfer from jail to prison, he submitted several bundles of legal documents along with some personal items to the facility's storage so that they could be picked up by his family members. Upon his release from prison at the end of his sentence on August 13, 2020, Plaintiff discovered that only parts of the documents were given to family members on January 2, 2020 and most were withheld.

140.  Also, Plaintiff had packed one bundle of legal documents to be transported  with him to prison. The bundle was given to staff along with some other personal items to be stored on the transporting bus.

141.  Plaintiff left Sheriff's custody on January 3, 2020. The legal documents were never put on the bus and received at destination according to North Kern State Prison officials.

142.  As stated earlier, the entire exculpatory evidence seized by Sheriff were erased. The documents proving that evidence was withheld/manufactured by County have vanished from Plaintiff's electronics.

143.  Sheriff has maliciously undermined Plaintiff's ability to sue by concealing and manufacturing evidence. Sheriff would not release any of the videos that would prove its crimes.

144.  As will be detailed below, the judge, Sheriff and County have doctored proceedings' reporter's transcripts in order to deprive Plaintiff of a fair appeal. Officials have inserted into transcripts dialogues that never happened during the trial. Transcripts have been altered in order to deceive appellate judges reviewing the case.

## VI. COUNTS

### FIRST CAUSE OF ACTION

### Right to Be Secure from Unreasonable Seizures

### 42 U.S.C. §1983 - Fourth Amendment; Art. 1, §13, California

### Constitution

145. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs 1 through 144 as though fully set forth hereat.

146.  Without the documents that were illegally confiscated/withheld/destroyed by Sheriff (concealment of evidence), Plaintiff will lose the ability to effectively execute his appeal and exonerate himself from false charges and to overturn the wrongful conviction.

147.  As a wrongfully convicted felon, Plaintiff has lost the ability to retain his several state licenses, such as but not limited to real estate sales, construction, appraisal,

inspections and consultation. Plaintiff has spent a lifetime and a fortune acquiring the licenses. Without the licenses, Plaintiff cannot rent, work and make a living. Plaintiff is living on government assistance right now.

148.  Plaintiff has lost millions of dollars in past and future income because of the loss of his licenses.

149.  As a wrongfully convicted felon, Plaintiff has lost the ability to own and carry a gun at a time when he has received many death threats from parties to this case.

150.  While in custody of North Kern Prison, Plaintiff was assaulted and seriously injured at least six times. While lucky to leave prison alive, he is at this time in hiding due to credible threats of violence made against him. Without protection of a gun, Plaintiff's life could be in danger. It is very imperative to him to overturn the wrongful conviction and regain the right to own a gun for protection of his life and limb.

151. Plaintiff is informed and believes that the acts of the Defendants and their employees and agents were intentional in failing to protect and preserve Plaintiffs' property and that, at minimum, Defendants were deliberately indifferent to the likely consequence that the property would be seized and destroyed unlawfully, based on the past circumstances of similar constitutional and statutory violations of the law.

152. As a direct and proximate consequence of these unlawful acts, Plaintiff has suffered and continue to suffer loss of personal property and is entitled to compensatory damages for injury to property.

153. Plaintiff has suffered malnutrition because of theft of his food and lack of proper diet during trial.

**SECOND CAUSE OF ACTION**

**Violation of Civil Rights: Interference by Threat, Intimidation or Coercion**

**California Civil Code § 52.1**

154. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs 1 through 153 as though fully set forth hereat.

155. Defendants' agents and employees have used solitary confinements, threats of solitary confinements and intimidation to interfere with Plaintiff's rights to maintain his personal possessions in the exercise of Plaintiff's rights secured by the Constitution of the United States, the Constitution of the State of California, and the statutory laws of the State of California.

156. Plaintiff is entitled to an injunction pursuant to California Civil Code §52.1. Plaintiff is also entitled to damages pursuant to Civil Code §§ 52 and 52.1.

**THIRD CAUSE OF ACTION**

**Violation of Civil Rights: 42 U.S.C. § 1983, Fourteenth Amendment**

**State Created Danger**

157. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs 1 through 156 as though fully set forth hereat.

158. By taking and destroying Plaintiff's legal documents, the acts of Defendants, their employees and agents, have created a danger for Plaintiff by exposing him to physical harm by people set to exact revenge on Plaintiff for his dogged pursuit of the truth about San Bernardino terror attack.

159. As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiff has suffered and continues to suffer actual and potential injury to his health and safety and is entitled to compensatory damages for his property and other injury to his mental and physical health.

**FOURTH CAUSE OF ACTION**

**Failure to Protect Against Inmate Violence**

160. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 159 of this Complaint with the same force and effect as if fully set forth herein.

161.  In violation of Plaintiff's Eighth Amendment rights, not only Sheriff has failed to protect Plaintiff against violence by other inmates while in its custody, but on the contrary, it has repeatedly forced other inmates to attack Plaintiff in order to break him.

**FIFTH CAUSE OF ACTION**

**Denial of Medical Care**

162. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 161 of this Complaint with the same force and effect as if fully set forth herein.

163.  Defendants and their agents and employees violated the Eighth Amendment rights of Plaintiff when they restricted his access to proper medical care.

164.  As the result of this violation, Plaintiff was not able to receive proper medical care while in custody of Sheriff and as the result has been permanently injured.

165. As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiff has suffered and continues to suffer actual and potential injury to

his health and safety and is entitled to compensatory damages for his property and other injury to his mental and physical health.

## SIXTH CAUSE OF ACTION

### Denial of Access to Library

166. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 165 of this Complaint with the same force and effect as if fully set forth herein.

167.  Defendants and their agents and employees violated the Eighth Amendment rights of Plaintiff when they restricted his access to the law library and legal material when he was going through the trial process.

168.  As the result of this violation, Plaintiff was not able to adequately represent himself at the trial resulting in his wrongful conviction.

## SEVENTH CAUSE OF ACTION

### Retaliation for Filing Grievances

169. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 168 of this Complaint with the same force and effect as if fully set forth herein.

170.  Plaintiff was threatened not to pursue grievances against Sheriff and when he exercised his constitutional right to pursue grievances, he was punished by being sent to a Hole.

## EIGHTH CAUSE OF ACTION

### Failure to Provide Decent living Conditions

COMPLAINT PURSUANT TO 42 U.S.C. 1983 AND DEMAND FOR JURY TRIAL- 32

171. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 170 of this Complaint with the same force and effect as if fully set forth herein.

172.  In violation of Plaintiff's Eighth Amendments rights, Sheriff failed to provide decent, safe and humane living conditions which resulted in Plaintiff's physical and emotional harm.

## NINTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### (Cal. Govt. Code § 829 and California Common Law)

173. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs 1 through 172 as though fully set forth hereat.

174.  Sheriff applied maximum mental pressure on Plaintiff while in its custody so that Plaintiff would fail his trial.

175.  Plaintiff has suffered mental and physical injuries while in custody of Sheriff.

## TENTH CAUSE OF ACTION

### Substantive Due Process and Violation of Bane Act (Cal. Civil Code § 52.1)

176. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs 1 through 175 as though fully set forth hereat.

177.  The repeated violence perpetrated on Plaintiff by other inmates at the behest of Sheriff in order to affect the outcome of the trial, constitutes violation Bane Act and as the result Plaintiff is entitled to triple damages.

COMPLAINT PURSUANT TO 42 U.S.C. 1983 AND DEMAND FOR JURY TRIAL- 33

178.  Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparably injured by the conduct of the defendants unless this court grants the declaratory and injunctive relief which plaintiff seeks.

## VII. INJUNCTION

179.  Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs 1 through 178 as though fully set forth hereat.

180.  Upon release from prison, Plaintiff obtained two sets of trial reporter's transcripts from the appellate attorney assigned to him by the appellate court.

181. One set is what was prepared for the motion for new trial, and the other is the one provided to the appellate attorney.

182.  The two sets, both of which are doctored, are even different from each other in that County discovered that there was a mistake made in the first set due to a perjury discrepancy and as such the second set seems to have been altered even further.

183.  An investigation of the transcripts will reveal that the dialogues contained in the transcripts never actually occurred during the trial and if they did, this would be an absolute proof of the perjury of D.A.'s witnesses.

184.  As things stand, the appellate court is making a decision based on faulty transcripts which would deprive Plaintiff of a fair and impartial review.

185.  Not only County deprived Plaintiff of a fair trial through criminal acts and corruption, it is now depriving Plaintiff of a fair appeal process.

186.  plaintiff respectfully requests of this Honorable Court to cause the examination of the transcripts as it deems fit.

187.  Without accurate transcripts, Plaintiff will be irreparably harmed. Plaintiff has no other remedy than an injunction.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment granting Plaintiff:

a. A declaration that the acts and omissions described herein violated Plaintiff's rights under the Constitution and laws of the United States.

b.  An injunction ordering the audit of trial's reporter's transcripts for authenticity.

c.  Compensatory damages in the amount of $1000,000 against each defendant, jointly and severally.

d.  Punitive damages against each defendant to be determined.

e.  Treble damages under Civil Code Section 52.1.

f.  A jury trial on all issues triable by jury.

g.  Plaintiff's costs and any attorney's fees incurred.

h.  Any additional relief this Court deems just, proper, and equitable.

///

///

Dated: January 1, 2022

Respectfully submitted,

_____

Aladdin Dinaali

4160 W 182nd Street, Apt. 217

Torrance, CA 90504

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at Torrance, California on January 1, 2022

_____

Aladdin Dinaali, Plaintiff in Pro Per